RECEIVED
USDC, WESTERN DISTRICT OF LA
TONY R. MOORE, CLERK
DATE 6/3/13
BY

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA DIVISION

| | |
|---|---|
| EDDIE JOE BUSH, et al., <br> Plaintiffs | CIVIL ACTION <br> SECTION "P" <br> NO. 1:13-CV-00452 |
| VERSUS | |
| FRED PHARIS, et al., <br> Defendants | JUDGE DEE D. DRELL <br> MAGISTRATE JUDGE JAMES D. KIRK |

### REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE

Before the court is a verified civil rights complaint filed by pro se plaintiffs Eddie Joe Bush ("Bush") and Joyce Ann Sutter ("Sutter") on March 1, 2013. The named defendants are attorney Fred Pharis, real estate agent Prissy Reap, Sean McGlothlin, Aleshia McGlothlin, Theresa Murphy a hospital case worker employed at Christus St. Frances Cabrini Hospital), "Cabrini Notary Public," "Nurse Mike" (an employee of Christus St. Frances Cabrini Hospital), Diana Harris (administrator of Christus St. Frances Cabrini Hospital), Steven Wright (director of Christus St. Frances Cabrini Hospital), Officer Andre Williams (employed by the City of Alexandria Police Department), Detective Wade Bourgeois (employed by the City of Alexandria Police Department), attorney William B. Owens a/k/a Bill Owens, Chief Loren Lampert (Chief of the Alexandria City Police), and Sheriff William Earl Hilton (Rapides Parish Sheriff).

Sean and Aleshia McGlothlin filed a motion to dismiss pursuant to Fed.R.Civ.P. rule 12(b) (Doc. 5), alleging a failure to state a

claim on which relief can be granted, which plaintiffs oppose (Docs. 11).[1] That motion is now before the court for disposition.

Mandates

It is noted that plaintiff Joyce Sutter did not sign the complaint, but plaintiff Bush attached a copy of a written contract of mandate in which Sutter granted Bush the power to make financial, real estate and health care decisions for her. (See Doc. 1, agency contract between Sutter and Bush.)[2] Therefore, to the extent a lawsuit will protect Sutter's property interests, Bush may pursue it as Sutter's mandatary. See La.C.C. art. 3001. LSA-C.C. art. 2989 provides: "A mandate is a contract by which a person, the principal, confers authority on another person, the mandatary, to transact one or more affairs for the principal."

Although Sutter apparently became incapacitated before she went into the hospital, it bears noting that, pursuant to La.C.C. art. 3026, Incapacity of the principal, "In the absence of contrary agreement, neither the contract nor the authority of the

---

[1] Although extraneous evidence outside of the pleadings is attached to the motion, it will not be considered with regard to defendants' motions. Therefore, defendants motions are considered as motions to dismiss, and not as motions for summary judgment. See Baker v. Putnal, 75 F.3d 190, 196 (5th Cir. 1996); Fed.R.Civ.P. rule 12(b).

[2] Documents attached to the complaint are considered part of the pleading and not extrinsic evidence. Paulemon v. Tobin, 30 F.3d 307, 308-09 (2nd Cir. 1994); Hal Roach Studios v. Richard Feiner & Co., 896 F.2d 1542, 1555 n. 19 (9th Cir. 1990). Also, Nishimatsu Const. Co., Ltd. v. Houston Nat'l Bank, 515 F.2d 1200, 1206 (5th Cir. 1975); Fed.R.Civ.P. rule 10(c).

2

mandatary is terminated by the principal's incapacity, disability, or other condition that makes an express revocation of the mandate impossible or impractical." Therefore, the agency contract was not terminated by Sutter's incapacity.

Sutter passed away on Monday, May 20, 2013. LSA-C.C. art. 3024(1) supplies the *general* rule that the mandate and Bush's authority as mandatary terminated at the death of the decedent. However, Bush was bound to complete the mandate by defending and protecting the decedent's wishes after her death through successfully litigating the validity of the mandate and his actions as mandatary. LSA-C.C. art. 3030; In re Succession of Badeaux, 2998 CA 1085 (La. App. 1st Cir. 3/27/09) 12 So.3d 348, 354, writ den., 2009-C-1245 (La. 5/29/09), 9 So.3d 166. Therefore, to the extent Bush is attempting to protect Sutter's property interests, Bush's mandatary duty extends past the time of Sutter's death pursuant to his continuing obligation to ensure that Sutter's property and financial interests are protected. In re Succession of Badeaux, 12 So.3d at 354.

The McGlothlins also contend that Sutton moved into their home after she left the hospital and, about two weeks after her stroke, she signed and gave them a power of attorney over her affairs while she was recovering from her stroke; therefore, Bush's power of attorney was terminated. However, the McGlothlins have not argued that Bush's mandate was not valid.

3

Since the McGlothlin's mandate is attached to their motion to dismiss as extrinsic evidence, it will not be considered. See Fed.R.Civ.P. rule 12(b). It is not necessary to decide which mandates were valid, and when, in order to decide this motion, and this court makes no findings with regard to the validity of the contracts of mandate.

Allegations in the Complaint

Plaintiffs allege that, in September 2012, Sutter, an 81 year old woman who lived alone at 431 Camille Street in Alexandria, Louisiana and used a wheel chair, offered to employ Bush, a friend and former employee, because her four late employees had quit or been fired; at least one of the former employees (who had apparently had a revocable power of attorney) had stolen money and charged over $10,000 on her credit card, they had left her home in a grave state of neglect and disrepair, and they had not paid her bills (Doc. 1). Plaintiffs contend that Sutter's pets' feces were scattered throughout the house, there was trash and garbage strewn about, and her utilities had been cut off. Although Sutter filed a police report against the four former employees for theft, she did not pursue the charges for fear of retaliation (Doc. 1).

Plaintiffs allege that, between September 10, 2012 and November 12, 2012, Bush and Sutter signed a written contract of mandate, granting Bush the power to assist Sutter with her personal property, and health decisions; pursuant to that contract, Bush

assisted Sutter in straightening out her finances so she could live within her social security income, cleaned and repaired her home, signed papers on Sutter's behalf with the her banker and her real estate agent, and instituted a daily routine of cleaning Sutter's house, preparing her meals, giving her medications, feeding her pets, doing her laundry, retrieving her mail, handling her business, running errands, and occasionally driving her places (Doc. 1).

Plaintiffs further allege that, around November 13 and 14, 2012, when Bush arrived at Sutter's home to begin his work day, he found her lying on the floor in her bedroom (Doc. 1). Since that was the second such occurrence, Bush explained to Sutter that it was dangerous for her to live alone and that she needed 24 hour care (Doc. 1). Bush explained to Sutter that she could give up her possessions and live in a nursing home, or she could continue to live in her home if he moved in with her and took take care of her; Sutter chose to have Bush move in with her and gave him permission to clear out two adjacent bedrooms for his use (Doc. 1).

On November 22, 2012 (Thanksgiving Day), Bush (who had not yet moved in) arrived at Sutter's residence and did his daily work, then left to attend a Thanksgiving dinner at his son's home; Bush returned later with a meal for Sutter and to take her to visit her good friend (and his ex-wife), Gwen Bush, who was in a nursing home in Pineville, Louisiana (Doc. 1). However, Bush found Sutter in

5

her wheelchair in the kitchen in a state of "paralyzed" shock; when Bush was get Sutter to respond to him, he called 911 for emergency help (Doc. 1).  A fire department rescue truck and an ambulance soon arrived, stabilized Sutter, and asked Bush which hospital they should take her to; Bush told them to take her to Cabrini because it was the closest and she has been there before (Doc. 1).  Bush then secured Sutter's pets and followed the ambulance (Doc. 1).

Between November 22-25, 2012, Bush was in contact with Prissy Reap (Sutter's realtor), attorney Bill Owens, Theresa Murphy (Sutter's caseworker at Cabrini, and Dr. Thuma at Cabrini (Doc. 1).  Murphy advised Bush that Prissy Reap had said Bush may not have proof of his "legal relationship" to Sutter, and Dr. Thuma told Bush to bring whatever he had showing his legal relationship to Sutter to the hospital because she had come very close to dying and a decision needed to be made immediately (Doc. 1).  Bush gave Dr. Thuma a copy of his September 28, 2012 contract with Sutter and decided an attempt should be made to revive her if her assisted breathing failed (Doc. 1).  Bush then continued to care for Sutter's home and pets and continued to prepare to move in with her (Doc. 1).  Bush saw Sean McGlothlin (one of Sutter's neighbors) frequently while he worked at Sutter's house, but never spoke to him (Doc. 1).

On November 26, 2012, Bush visited Sutter at the hospital before beginning his work day; the night before, Dr. Thuma had

6

advised Bush that Sutter still had not recovered her ability to speak and still needed assistance breathing (Doc. 1). Bush stopped by the hospital again that evening, combed Sutter's hair, and spoke to her; Sutter than opened her eyes and spoke to Bush about her pets and the progress he was making moving in (Doc. 1). Bush then left Sutter, and stopped to talk to Murphy, who told him he needed a medical power of attorney, but that he could not get one until Sutter regained her power of speech (Doc. 1). Bush told Murphy that Dr. Thuma had told him his contract with Sutter was sufficient to provide him with a medical power of attorney, that he had made a decision to revive her if she needed assisted breathing again, and that he had just left Sutter and she had been speaking to him (Doc. 1). "Nurse Mike," who was present during the conversation between Bush and Murphy, retrieved Sutter's medical file (Doc. 1). Murphy, "Nurse Mike," a notary public employed at Cabrini Hospital, and two other female employees at Cabrini conferred, studied the contract, and questioned Sutter about the contract, who made decisions for her, and where she would like to live (Doc. 1).

The next day, Bush went to work at Sutter's home, took care of her pets, cleaned up, the noticed the animals were behaving strangely; when the dogs began barking, Bush looked outside and saw a police officer reaching for his side arm and yelling at the dogs to "get back" (Doc. 1). In response to questions by Officer Andre Williams, Bush explained he worked for Sutter at her home, that he

7

was moving into the house in anticipation of her returning from the hospital and needing 24 hour care (Doc. 1). Officer Williams then patted Bush down and arrested him for burglary; when Bush saw Sean McGlothlin and asked him to come over than explain to the officer that he worked for Sutter, Officer Williams told McGlothlin to stay away (Doc. 1). Attorney Fred Pharis was then called to the scene and Bush's keys to Sutter's home were handed to Pharis (Doc. 1). Sutter's pets were removed from the house and taken to the animal shelter (Doc. 1). Officer Williams then informed Bush that McGlothlin had said he knew Bush worked outside of Sutter's home, but not in it (Doc. 1). Bush informed Williams that the cuff on his left arm was too tight and causing him great discomfort, but Officer Williams told him he needed to stay still (Doc. 1).

Plaintiffs further allege that Attorney Pharis told Sutter it was very important that she lie and tell Officer Williams that Bush was not allowed to work in her house, or else he would get away with stealing from her (Doc. 1). When Sutter became agitated, Pharis and Williams went to Cabrini and told Sutter what to say (Doc. 1). Bush was arrested and charged with simple burglary of an inhabited dwelling, and his son bonded him out (Doc. 1).

When Bush was released, he visited Sutter and was told by Murphy that Sutter had changed her mind and decided to go to a nursing home (Doc. 1). Bush also learned that Sean and Aleshia McGlothlin had visited Sutter, told her they had saved her home

8

from being robbed by Bush, and placed themselves on Sutter's contact list (Doc. 1). When Bush returned later in the day, Sutter had been removed from her room and no one would tell her where she was; Bush was removed from the hospital and forbidden to contact Sutter on threat of arrest (Doc. 1). The hospital administrator them appeared and told Bush that the hospital had a duty to protect Sutter, that she was not allowed to have any visitors, and that Bush needed to contact Sutter's attorney if he wanted information about her, but would not tell Bush the attorney's name (Doc. 1).

## Law and Analysis

### Motion to Dismiss

A motion to dismiss an action for failure to state a claim admits the facts alleged in the complaint, but challenges plaintiff's right to relief based upon those facts. Crowe v. Henry, 43 F.3d 198, 203 (5th Cir. 1995). In particular, a complaint should not be dismissed for failure to state a claim unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. Hirras v. National Railroad Passenger Corp., 10 F.3d 1142, 1144 (5th Cir. 1994), vacated on other grounds, 512 U.S. 1231, 114 S.Ct. 2732 (1994); Doe, 753 F.2d at 1102. For the purposes of a motion to dismiss for failure to state a claim upon which relief can be granted, the factual allegations of the complaint must be taken as true, and any ambiguities must be resolved in favor of the

9

pleader. <u>Doe v. U.S. Dept. of Justice</u>, 753 F.2d 1092, 1101 (D.C.Cir. 1985). It is presumed that general allegations embrace the specific facts that are necessary to support the claim. <u>National Organization for Women, Inc. v. Scheidler</u>, 510 U.S. 249, 114 S.Ct. 798, 803 (1994), citing <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 112 S.Ct. 2130, 2137 (1992).

<u>Sean and Aleshia McGlothlin</u>

Bush contends in his complaint that Sean and Aleshia McGlothlin conspired with Fred Pharis to eliminate Bush as Sutter's care giver and agent, to prevent him from becoming a co-occupant of her home at 430 Camille Street. Bush contends the McGlothlins falsely accused him of burglarizing Sutter's home, although they knew he worked there and had often seen him going about his business inside and outside of the house, so they could gain physical control of Sutton and ownership of her property.

The McGlothlins contend in the motion to dismiss that the complaint should be dismissed because they are not state actors.

Section 1983 prescribes redress for conduct by any person who, under color of state law, acts to deprive another person of any right, privilege, or immunity secured by the Constitution and laws of the United States. 42 U.S.C. §1983. A plaintiff in a civil rights suit must show that the conduct complained of was committed by a person acting under color of state law. <u>Lugar v. Edmondson Oil Co., Inc.</u>, 475 U.S. 922, 937, 102 S.Ct. 2744, 2753 (1982).

Purely private conduct, no matter how wrongful, is not within the protective orbit of Section 1983. Shelley v. Kraemer, 334 U.S. 1, 13, 68 S.Ct. 836, 842 (1948).

The traditional definition of acting under color of state law requires that the defendants in a §1983 action have exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law. To constitute state action, the deprivation must be caused by the exercise of some right or privilege created by the state or by a person for whom the state is responsible and the party charged with the deprivation must be a person who may fairly be said to be a state actor. West v. Atkins, 487 U.S. 42, 47, 108 S.Ct. 2250, 2254 (1988).

Accepting plaintiffs' allegations as true for purposes of this motion, plaintiffs have not alleged or shown that the McGlothlins are or were state actors. Plaintiffs allege only private conduct on the part of the McGlothlins. Therefore, plaintiffs have not alleged a civil rights claim pursuant to Section 1983 or Section 1985 (conspiracy provision) against Sean and Aleshia McGlothlin, and plaintiffs' civil rights claims against the McGlothlins should be dismissed without prejudice to their right to pursue state law claims against these defendants in state court.

## Conclusion

Based on the foregoing discussion, IT IS RECOMMENDED that

plaintiffs' claims against Sean McGlothlin and Aleshia McGlothlin are dismissed without prejudice.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed.R.Civ.P. 72(b), the parties have **fourteen (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof. A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing. Timely objections will be considered by the district judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) CALENDAR DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED at Alexandria, Louisiana, on this 31st day of May 2013.

JAMES D. KIRK
UNITED STATES MAGISTRATE JUDGE